In re RAMSAY et al.

(District Court, E. D. New York. June 10, 1899.)

1. TOWAGE—NEGLIGENCE IN LANDING—EVIDENCE.

On a question whether a tug negligently swung the starboard corner of the bow of a scow against a pier with great force, the master of the scow testified that the contact broke a stringpiece in the pier, that he heard the wood cracking and breaking, and that a day or so later he visited the place, and found the timber broken and apparently sound within. *Held*, that the breakage of the timber by reason of the contact was not shown.

2. SAME.

Nor was negligence shown by the fact that the assistant master of the scow, who was standing on the bow, about a foot from the edge, lost his equilibrium upon the contact.

3. SAME.

The scow was fastened at her stern, and was swinging around the end of some tugs lying at the end of the pier, lashed together. When her starboard bow was some 16 feet from the pier, she was stopped. She then started and swung against the pier. *Held*, that in such space she could not have gained sufficient headway to come into such violent contact with the pier as would show negligent operation by the tug.

4. SAME.

In any event, the captain of the tug was not bound to anticipate the assistant master's presence on the bow of the scow, the plan for making the landing not requiring the assistant to be there.

Carpenter & Park, for petitioners.

Charles J. Patterson and Mr. Cropsey, for claimant.

THOMAS, District Judge. The petitioners' tug, Grace S. Ramsay, on December 4, 1895, towed a dumping scow in the East river, from Stanton street, and landed the same on the lower side of the pier at Rutgers street. The tide was flood, the night was clear, and at

the pier surrounding objects could be seen at a sufficient distance to prevent embarrassment in operation. The tug is 75 feet, and the scow about 100 feet, in length. The dumper was on the starboard side of the tug, and its bow extended some 30 feet beyond the tug's bow, while the latter's stern was a few feet beyond the stern of the scow. Two tugs lay lashed together at the end of the pier. The bow of the inner tug and the stern of the outer tug projected into the slip some 5 feet beyond the lower side of the pier, while other boats lay on the next pier below. The Ramsay, facing down stream, placed the dumper alongside the outer tug, and fastened a line about 15 feet in length from the scow's quarter cleat, forward of her after bridge, to the bow of the outer tug. Thereupon the Ramsay went ahead, with the intention and with the result of working the scow around the two tugs, and bringing it up against the lower side of the pier. When the scow came in contact with the pier, the claimant, who was employed thereon as an assistant to the master, and who was on the bow of the scow, was injured by reason of his foot coming between the outer side of the scow and pier, and such injury necessitated the amputation of his leg. It is contended by the petitioners that the stern of the scow was worked around the lower ends of the tugs, and came in contact with the lower side of the pier, before the bow of the scow touched the same, and that the lines holding such tugs rendered sufficiently to allow this. In view of the fact that there were but 15 feet of line between the scow and the outside tug, it is considered that this contention is not true. To permit this result, the line should have been sufficiently long to reach from the bow of the outside tug across one-half the width of such tug, and the whole width of the inside tug, which apparently was not the fact; and, as the captain of the Ramsay testifies that the line was not disturbed, it is considered that it was physically impossible for the stern of the scow to make the first contact with the pier. This conclusion is strengthened by the evidence of the claimant and the master of the scow that the fore part of the scow first came against the pier. The persons last named stated that the scow was worked around into the slip until her bow was from 10 to 16 feet from the side of the pier, and that thereupon the tug stopped working, and that the boats remained still in the water for a space of time, which the claimant fixes at "a few minutes." The claimant contends that the Ramsay started up and swung the scow so that her starboard corner came in violent contact with the pier, and that the violence of the collision was such that a stringpiece on the dock, 12 inches in width and thickness, was broken through. The claimant does not testify to the broken timber, but the master of the scow testifies that, although he did not see on the night in question that the timber was broken, yet he did hear the "wood cracking and breaking" on such night, and that within a day or so thereafter he visited the place and found the timber in the condition stated, and that, while the timber was "brown or gray looking" outside, it was sound within. The evidence that the contact broke the timber is entitled to consideration, but it is not convincing. The sound resembling the cracking of timber, when boats come against the side of a pier, is so well known

that it cannot be accepted as a persuasive indication of the breaking of the timber, and the condition in which the timber was found a day or more after the accident does not trace the cause of the breakage with sufficient directness to the contact on the night of the accident. Nevertheless the entire evidence tends to show preponderatingly that the scow came against the pier with sufficient force to cause the claimant to lose his balance, and that the injury resulted therefrom. But a contact sufficient to overcome the equilibrium of the claimant is not necessarily negligent. Therefore the question recurs whether the collision with the pier was so forceful as to indicate negligence in operation. The scow was fastened at her stern, and was swinging around the end of the tugs lying at the end of the pier. When the Ramsay's bow was some 16 feet from the pier, she stopped. She then started, and went with a swing to starboard. It is not believable that she could, starting from a standstill, swing to starboard and move with sufficient rapidity to come into a violent contact with the pier. The stern line would prevent headway, and the motion would be substantially lateral. The engineer of the tug testifies that in the space of 16 feet, in slack water, the tug and dumper could get hardly any headway. This evidence seems, in the main, credible; and it seems incredible that, in moving the boats with considerable lateral direction, anything save a slow, drifting motion could be obtained. Of course, the action of the flood tide must be considered. The captain of the Ramsay states:

"The tide has some effect, although after you get headed into that slip you lose the strength of the tide. There is a dock in the next slip below, and it is a box dock, and it takes the strength of the tide outside. You have it all on the stern of your dumper when you are working her around."

In the absence of contrary evidence, some force must be given to this statement; and, even without it, the strength of the tide, assisted by the operation of the tug, does not seem sufficient to create the momentum alleged by the claimant.

There is a further consideration casting grave doubt upon the claimant's right to recover. It is evident that the plan for making the landing did not require the claimant to be where he was. The operations were at the stern of the dumper, and, until direction was given by his superiors, no immediate duty called him to the place occupied by him; nor was the captain of the tug required to anticipate his presence near the edge of the dumper, and he owed the claimant no duty to use the care that such position would otherwise demand. The counsel for the claimant fairly states the latter's position:

"He had been standing on the deck of the scow, just inside the chockpiece, which is about fourteen or eighteen inches high; and when the scow struck the dock he was thrown over, with his hands on the stringpiece of the dock, and, in trying to save himself, pulled his right foot over the chockpiece, and caught it between the chockpiece and the dock."

Outside of the chockpiece there is a guard about 10 inches wide. Therefore it appears that the claimant, although standing within the chockpiece, was about a foot from the edge of the boat, with the evident intention of leaping upon the dock when opportunity should occur. The position was an unnecessary one, and it does not appear

that the claimant was justified in believing that at the time his services were required at that place. The captain of the tug testifies that he received no notice that they were going to move the scow or dumper towards the dock, although he knew that they were trying to put the bow up against the dock; that neither he nor anybody on the tug gave the claimant any orders about lines; that he did not send the claimant on the dock; that nobody had intimated to him (the captain) that there was any necessity for putting out lines; that he did not get out, and was not thinking about getting out, any lines; that he was waiting for orders; that lines were not needed. He also gave the following evidence:

"Q. What did he [claimant] go down there for? A. That is his place, always used to be, when we were landing,—on the bow deck. Q. You said you were waiting for orders from somebody to get a line? A. Yes, sir. Q. You hadn't given Anderson any orders? A. No, sir. Q. So he didn't go down there for that purpose? A. I suppose he went down to stand by. Q. He didn't do anything without your orders, would he? A. Oh, well, when he would— He knows just as well what to do as for me to tell him. Q. Tell us your place on the barge. A. I am supposed to be all over, but I am usually on the bow. Q. Is it necessary for you both to be on the bow? A. At that time we didn't know exactly what to do until we got orders to put lines out, so I was standing on the bridge. If he had given orders, I would have been ready. Q. So, if this man went down there to take a line, he did it without orders? A. I didn't give him any orders."

It is apparent that the claimant put himself in the position in the expectation that he might be useful in getting out the line, and while, perhaps, he may not be criticised for his zeal and readiness, this does not relieve the case of the fact that the captain of the tug did not intend to use him at the place; nor is it thought that the captain was required to anticipate his presence in close proximity to the edge of the scow. The claimant has suffered a severe and disabling injury, but it did not arise from the breach of any duty on the part of the petitioners. A decree should be entered dismissing the claim, with costs, and for limitation of the petitioners' liability.